TAYLOR & COHEN LLP

40 Worth Street, 10th Floor
New York, NY 10013
Tel (212) 257-1900
Fax (646) 808-0966
www.taylorcohenllp.com

August 21, 2019

*By ECF*

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: *United States v. Valters Volksons*, 16 CR 692-20 (JMF)**

Dear Judge Furman:

I represent Valters Volksons as CJA counsel and submit this letter in connection with his sentencing, which is scheduled for September 4, 2019. For the reasons set forth below, a sentence that is substantially below Mr. Volksons' Guidelines range of 27 to 33 months would be sufficient to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

When Valters came to the United States in October 2018, he believed – naively – that he was getting involved in a legitimate business venture, selling cars over the Internet. The offer that was made to him should have smelled fishy from the start. Even though he had no experience selling cars, Valters was offered 10% of the money paid by the buyers. All he had to do was set up the accounts, withdraw the money and give it to his handler. At the time, Valters was struggling financially while he pursued his dream of becoming a professional DJ. It seemed like a great opportunity, not just to make money but also to see a bit of the world outside his home country.

Valters accepted the offer and got on the flight to the United States. He had been in Miami, Florida for about a week when his girlfriend in Latvia told him that she was pregnant. Valters wanted to return home right away, but his handler said he had to stay until the job was done. Not long after, Valters realized that the whole operation was a scam. Valters' handler told him the cars they were selling did not exist. Valters said he wanted to go home, but his handler told him again that he had to stay until the job was done.

In an act of disobedience, Valters went to one of the banks where he had an account and told a teller he wanted to close his account. He withdrew the $20 he had deposited when he opened the account. When he returned to his motel, he gave the $20 to his handler and told him that the bank said there was a problem with the

August 21, 2019
Hon. Jesse M. Furman
Page 2

account and he had to close it. His handler was angry, and Valters became frightened. He was worried about what might happen to his family in Latvia if his resistance was too obvious. From then on, he did as he was told and prayed that the ordeal would be over soon.

Valters is acutely aware that what he did was wrong. He withdrew approximately $197,500 from the other two account he opened in full knowledge that innocent people were being ripped off. He received his share of the money from his handler. All the while, he tried not to think about the people who were being cheated. Instead, he thought about his family, his girlfriend and the child who would arrive the following summer. Somehow, he hoped, it would all turn out okay for himself as well as the victims of the scam.

It did not. On December 2, 2018, about six weeks after he arrived in the United States, Valters was arrested at JFK airport before he boarded a flight back to Latvia. He immediately confessed his crime to the FBI. Since then, he has been in custody. Jail has been very hard for Valters. He has never been imprisoned before. His English is not very good, and his family is too poor to put enough money in his commissary so he can call home. He has been almost completely cut off from the world outside the jail. Valters' girlfriend broke off their relationship after she learned of his arrest. Their child should have been born by now, but Valters has had no word from his former girlfriend for months. He is heartbroken and sick with guilt over what he has done.

Valters knows that he deserves punishment. However, he has already been punished severely. For nine months he has been in jail an ocean away from everyone he loves and who loves him. He has lost his relationship with a woman he calls his soulmate. His name has been tarnished, and he will carry with him the disgrace of his conviction. Everyone in his hometown in Latvia knows about Valters' current travails. His family and neighbors cannot understand why he made the mistake he did. One family friend worries that the shame will destroy him.

Although Valters committed a serious crime, he is a good person. In their letters to the Court, his family and neighbors describe a young man who is good-natured and unfailingly polite, but also a bit of a misfit. Valters was struggling to find his way in the world, but he never resorted to crime before this offense. His family and neighbors are sure he never will again.

## The Offense Conduct and Guidelines Range

On October 18, 2018, Valters entered the United States as a tourist. *See* PSR ¶ 12. His role in the conspiracy was to open accounts at three banks using incorporation documents for a fake business that were provided by his handler and to withdraw money from the accounts when instructed to do so. *See id.* ¶¶ 13-15, 23.

August 21, 2019
Hon. Jesse M. Furman
Page 3

Other members of the conspiracy posted advertisements for cars and other moveable property on the internet. *See id.* ¶ 8. The victims contacted members of the conspiracy who negotiated the sale of the property and instructed the victims to wire payment to one of the accounts opened by Valters or another co-conspirator fulfilling the same role. *See id.* ¶ 9.

Victims wired approximately $206,050 into two of the accounts opened by Valters. *See id.* ¶ 49. (No money was wired into the account that Valters tried to close.) Valters withdrew approximately $197,500 and received approximately 10% of this amount. Some of his share he wired to family members in Latvia, while the rest – approximately $5,250 in U.S. and E.U. currency – was seized at the time of his arrest. *See id.* ¶ 38.

Valters waived indictment for his offense and pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343. The Guidelines range to which the parties stipulated in his plea agreement is 27 to 33 months. Probation has independently calculated the same Guidelines range.

## Valters' History and Personal Characteristics

Valters was born and raised in a Salacgriva, Latvia, a town of about 3,000 inhabitants on the Baltic Sea. It is a town where everybody knows everybody. Numerous neighbors and other friends of Valters' family have written letters to the Court to describe their shock when they learned that he committed a crime in America. The conduct that resulted in his conviction simply does not jibe with the Valters they know, a young man who was always polite, considerate and helpful to his parents.

Although Valters grew up in a closely-knit and stable family, his childhood was far from idyllic. Valters had ADHD and struggled in school. He was repeatedly held back I his early teens. Valters' classmates were cruel to him; they taunted him so much that he had to complete his primary school education in a neighboring town.

Valters' home life was difficult as well. Family friends, the Liepinas, write that he was very emotional and sensitive as a child. When Valters was in his early teens, his father frequently subjected him to corporeal punishment. One imagines that Valters' father thought he was helping his son grow up. Valters relates that his father stopped the punishment when he realized it was a misguided approach.

After primary school, Valters enrolled in a vocational school for several years but did not pass the exams. Afterwards, he moved to the capital, Riga, in search of work. He held a wide variety of short-term jobs, including working at a telemarketing company, a bowling alley, a theater, a casino and a bar. According to

August 21, 2019
Hon. Jesse M. Furman
Page 4

the Liepinas, Valters was the only one in his family who struggled to "find his calling."

In fact, music is Valters' calling. In his early twenties, he decided he wanted to be a professional DJ and started to build a career performing at weddings and nightclubs. His sisters write in their letter that they would be very happy if he can realize his dream of finding success as a DJ after his release.

Valters intends to return to Salacgriva. His parents have health problems and need his help around his house. If he cannot make it as a professional DJ, he will work at his father's auto garage.

While in the MCC, Valters completed the suicide prevention program and was a member of the inmate companion watch. *See* Ex. M. Such altruism is emblematic of the quality of character Valters' friends and family attest to in their letters to the Court. Even now, at the very lowest point in his life, Valters wants to help others and prove that he has reformed.

## Letters of Support

A large number of Valters' family and neighbors have written letters to the Court. They describe a young man who is courteous and kind. They also describe his struggles: with ADHD, with bullies when he was at school, with finding a steady career in Latvia's depressed economy. The letters also make clear that Valters has the strong support of his family and community, who will ensure that he resumes a productive life upon his return to Latvia.

Valters has written to the Court as well. His letter is unvarnished, and in his imperfect English he looks back at the course of his life until now and wrestles with his intense remorse over his conduct. He is sorry for the harm he did to innocent strangers as well as his own family.

Below is a chart listing the letters enclosed with this submission.[1]

| Author | Relationship to Valters | Exhibit |
|---|---|---|
| Valters Volksons | | A |
| Inese Volksone | Mother | B |

---

[1] Personal identifying information has been redacted from the letters in accordance with the Southern District of New York's ECF Privacy Policy.

August 21, 2019
Hon. Jesse M. Furman
Page 5

| | | |
|---|---|---|
| Evita Majore | Sister | C |
| Anite Kupce | Aunt | D |
| Anita Liepina, Dainis Liepins & Liva Liepina | Family friends | E |
| Andrejs Paupers | Family friend | F |
| Maija Andersone | Family friend | G |
| Mara Gobina | Family friend | H |
| Sarmite Persidska | Family friend | I |
| Baiba Stankevica & Stanislavs Stankevics | Family friends | J |
| Rihards Builis | Family friend | K |
| Reinis Liliensteins | Chairman of Salaca Sports Club | L |

## **Argument**

As the Court knows, The Guidelines range is only "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Congress did "not intend that the guidelines be imposed in a mechanistic fashion." *United States v. Lara*, 905 F.2d 599, 604 (2d Cir. 1990) (*quoting* S.Rep. No. 225, 98th Cong., 2d Sess. 52, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3235 (Legislative History)). Rather, it was Congress' view that "the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case." *Id.*

After the Court calculates the applicable Guidelines range, it must consider the factors that are set forth in 18 U.S.C. § 3553(a), including

   (1) "the nature and circumstances of the offense and the history and characteristics of the defendant";

   (2) the four purposes of sentencing set forth in Section 3553(a)(2);

   (3) the kinds of sentences available;

   (4) the Guidelines range itself;

August 21, 2019
Hon. Jesse M. Furman
Page 6

     (5) any relevant policy statement by the Sentencing Commission;

     (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and

     (7) the need to provide restitution to victims.

18 U.S.C. § 3553(a). Section 3553(a) further provides that, in determining the appropriate sentence, the sentencing judge should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

     (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B)     to afford adequate deterrence to criminal conduct;

     (C)     to protect the public from further crimes of the defendant; and

     (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

18 U.S.C. § 3553(a)(2).

     A sentence that is a substantial downward variance from Valters' Guidelines range is warranted in this case. As a preliminary matter, the Second Circuit has invited district judges to consider non-guideline sentences in all fraud cases because of the "unusualness" of the fraud guidelines, under which the loss amount is the "principal determinant of the adjusted offense level and hence the sentencing range." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Put another way, the Second Circuit has recognized that for many defendants in fraud cases a Guidelines sentence is a punishment that simply does not fit the crime. *See Algahaim*, 842 F.3d at 800. ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").

     Here, a substantial downward variance would be sufficient to achieve the goals of sentencing. *First*, a Guidelines sentence would be greater than necessary to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense. Valters himself as well as his family and neighbors acknowledge that he must be punished. But the punishment he has already received – nine months in federal jails – is already sufficient. During this time, Valters has received only a single non-legal visit. He does not have enough money to call home, to hear a friendly voice speaking his own language. Additionally, when

August 21, 2019
Hon. Jesse M. Furman
Page 7

Valters returns to Salacgriva, he will be a convicted felon. In a town where everybody knows everybody, everybody will know Valters as the person who was locked up in the United States. The Liepina family refers to this in their letter to the Court. They say that their society has a very low level of acceptance to ex-convicts. They worry that the loss of his good name will be a heavy burden for him in the years ahead.

   *Second*, imposing a sentence that represents a substantial downward variance from the Guidelines would also be sufficient to achieve specific and general deterrence. As Valters writes in his letter to the Court, this experience has been a very significant life lesson. Before his arrest, he did not consider carefully enough the consequences of his actions. After nine months in a U.S. jail, that has changed. Valters will consider his actions much more carefully from now on. As for general deterrence, empirical studies show that it is the certainty of punishment, not the severity that achieves general deterrence.[2] Here, Valters and his co-conspirators were arrested and imprisoned for a significant period of time. Everyone in Valters' hometown is aware of his punishment, and presumably throughout Latvia the message has been received that the United States will not tolerate conduct like Valters'.

   *Third*, the public – both in the United States and Latvia – has no need of protection from further crimes by Valters. Putting aside that he will be deported from this country, Valters has a very strong support network at home that will ensure that he never commits another offense. For his own part, Valters is very sorry for the hurt he cause the victims of the scam as well as his family. As he says in his letter to the Court, he knows that no amount of money is worth going to jail and making those who love him suffer as they have since his arrest.

   Additionally, the Court should consider the need to avoid unwarranted sentencing disparities between defendants who have engaged in similar conduct. In a sentencing memorandum relating to one of Valters' co-defendants, the government groups Valters with his co-defendants Toms Saulgriezis, Raitis

---

[2] *See*, *e.g.*, Valerie Wright, "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment," The Sentencing Project (Nov. 2010), *available at* https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/ (last visited April 15, 2019), at 9 ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive.").

August 21, 2019
Hon. Jesse M. Furman
Page 8

Grigorjevs, Agris Petrovs and Janis Berns.[3] To date, Mr. Saulgriezis and Mr. Grigorjevs are the only defendants in this grouping to have been sentenced. This Court imposed sentences of 14 months and 1 year and 1 day, respectively. The Court should consider those sentences, which were imposed for very similar conduct, when determining Valters' sentence.

Finally, counsel understands from consulting with a specialist in immigration matters that, notwithstanding Valters' ardent desire to return home to Latvia as soon as he completes his term of imprisonment for this offense, he is likely to be detained by INS for a period of weeks or even months before he is deported. We request that the Court consider this additional period of incarceration when determining Valters' sentence. Additionally, Valters consents to the entry of an order of removal to expedite his return to Latvia. At sentencing, we respectfully request that the Court enter such an order of removal.

## Conclusion

For the reasons set forth above, we respectfully request that the Court impose a significantly below-Guidelines sentence similar to those imposed on his co-defendants Toms Saulgriezis and Raitis Grigorjevs.

Respectfully submitted,

_____/s/_____
Zachary Taylor

cc:    Matthew Hellman, Esq.
       Daniel Nessim, Esq.
       Emily Johnson, Esq.
              Assistant United States Attorneys

Encl.

---

[3] *See* August 7, 2019 Letter of Geoffrey Berman to Hon. Jesse M. Furman (Doc # 339), at 3.