**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 28, 2019

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      **Re:**    ***United States* v. *Valters Volksons*, S23 16 Cr. 692 (JMF)**

Dear Judge Furman:

      The defendant in this case, Valters Volksons ("Volksons" or the "defendant"), is scheduled to be sentenced on September 4, 2019, having pleaded guilty to conspiracy to commit bank fraud and wire fraud. The Government respectfully submits this letter in advance of the sentencing. In a plea agreement between the parties, the Government and the defendant stipulated to a United States Sentencing Guidelines ("Guidelines") range of 27 to 33 months' imprisonment. For the reasons set forth below, the Government submits that a sentence within that stipulated Guidelines range is warranted in this case.

**A. Offense Conduct**

      1.   *The Fraud Scheme*

      As the Court is aware, this case involves a wire fraud and money laundering conspiracy operated by a network of individuals located in the United States and overseas. The conspiracy has targeted victims principally through variations on an internet fraud: a member of the conspiracy posts an advertisement for a car, boat, tractor, kitchen appliance, or other singular, expensive, and fungible property for sale on the internet. *See* U.S. Probation Office's Final Presentence Report, dated July 24, 2019 ("PSR") ¶ 8. These advertisements are typically posted on well-known websites involving either auctions or direct sales, such as eBay or Craigslist. *Id.* Though posted on sites where unaffiliated sellers can attempt transactions, the conspiracy often fraudulently utilizes the names, logos, and business pedigree of legitimate businesses to give the veneer of credibility to the ads, and take advantage of positive reviews attributed to the true businesses. *Id.*

      After a prospective victim makes an inquiry in response to an advertisement, the members of the conspiracy controlling the fake ads negotiate with the buyers, typically via e-mail. *Id.* ¶ 9. Again, the e-mail addresses mimic or duplicate those of the legitimate businesses. *Id.* The conspirators and victims come to an agreement, at which point, the conspirators provide wiring

instructions to the victims.  *Id*.  Maintaining the illusion of legitimacy, conspirators suggest an arms-length transaction by directing victims to third-party bank accounts, which are either corporate or business accounts.  *Id*.  Those accounts are opened at the banks in the names of shell corporations established for the purpose of furthering the fraud.  *Id*.  Once recruited by the conspiracy, members responsible for the bank accounts are named as the principals of the shell corporations, and in turn open accounts at multiple banks to await transfer of victim funds as directed by the co-conspirators controlling the online advertisements.  *Id.* ¶¶ 9, 10.

Victims then wire funds into the shell corporation bank accounts, believing they are transmitting funds in order to, for example, purchase a vehicle and pay for its transportation.  *Id*. ¶¶ 9, 10.  Next, conspirators who have established the accounts are alerted to the money transfers by other members of the scheme.  The same or next day of the transfer, members of the scheme controlling the accounts head to the banks and begin withdrawing funds.  *Id*. ¶ 10.  The withdrawals are made in cash, from both ATMs and the tellers at bank counters.  *Id*.  Where practicable, the withdrawals are under $10,000, to avoid reporting requirements and evade scrutiny by bank and law enforcement officials.  *Id*.

During this short period, victims are unaware that their funds are being drained, and the overriding goal of the conspirators is to take all the money before the funds can be frozen and otherwise stopped.  To accomplish this, conspirators will withdraw funds from numerous bank branches in rapid succession, frequently on the same day.  After funds are withdrawn, money is then distributed amongst the conspiracy in various ways, including via wiring or physical transportation, principally from within the United States back to Europe.  *Id.*  Victims do not ever receive the items they believed they were purchasing, and are generally unable to recoup their funds once the money has been withdrawn from the accounts.  *Id*.

### 2.   *The Defendant's Conduct*

Volksons was a member of the conspiracy who traveled to the United States, opened bank accounts, and withdrew victim funds.  *Id*. ¶¶ 12-14, 23-25, 29.  Volksons entered the United States at on or about October 18, 2018 on a tourist visa.  *Id.* ¶¶ 12, 77.  He remained in the United States through the time of his arrest on December 2, 2018, when he and three other co-conspirators were attempting to leave the United States at John F. Kennedy International Airport ("JFK").  *Id.* ¶¶ 32.  The day after Volksons arrived in the United States, a corporation named "VLTS Line Inc." was incorporated with the Florida Department of State in Volksons's name and using his personal information.  *Id*. ¶ 13.  Once in the United States, Volksons used the VLTS Line Inc. name to open business or corporate bank accounts at three banks.  *Id*. ¶ 23.  Victim funds were wired to two of these accounts during November 2018, and Volksons personally entered bank branches and withdrew victim funds from the VLTS Line Inc. accounts.  *Id*. ¶¶ 24-25. 38.

Upon his arrest, the defendant acknowledged that he was recruited in Latvia for the purpose of traveling to the United States and, once here, establishing bank accounts and withdrawing money from those accounts.  *Id.* ¶ 38.  Volksons was met in the United States by a "handler" ("CC-1"), who assisted him in establishing bank accounts and accompanied him to conduct withdrawals at banks.  *Id.*  In total, the bank accounts established by Volksons received approximately $206,050 in victim funds, and Volksons withdrew approximately $197,500 of victim funds from his

accounts. *Id.* ¶¶ 49, 121. Volksons claimed that admitted that he received 10 percent of the withdrawn funds, or approximately $20,000. (*Id.* ¶ 38, 52) of the money that he withdrew from these accounts as payment, and Volksonshad $3,000 and €2,000 in cash and on his person at the time of his arrest. *Id.* ¶ 38.

### 3. *The Status of Co-Defendants' Cases*

Twenty co-conspirators have been charged in the case pending before this Court to date, and ten have been sentenced by Your Honor. *Id.* ¶ 4.

Volksons is most similarly situated to the three co-defendants with whom he was arrested—Raitis Grigorjevs (sentenced to one year and one day); Agris Petrovs (sentenced to one year and one day); and Janis Berns (scheduled to be sentenced on September 17, 2019). These four individuals were all recruited abroad to participate in the fraud scheme, and all entered the United States on tourist visas in or around October and November 2018 and resided together in the Miami area. *Id.* ¶¶ 12, 32, 38. On November 28, 2018, another co-defendant, Martins Apskalns, was arrested in Latvia, and Apskalns consented to a search of his cell phone, which revealed text messages between Apskalns and CC-1, the "handler." These messages revealed that at the time of Apskalns's arrest, CC-1 was on the ground in the United States. The messages provided detailed information regarding the fraud scheme—including numerous messages related to victim transfers into accounts opened by Grigorjevs, Berns, Petrovs, and Volksons, as well as the corresponding withdrawals conducted by these four individuals. *Id.* ¶¶ 15-26, 31. Following Apskalns's arrest, Grigorjevs, Berns, Petrovs, and Volksons were instructed to fly home immediately because something had happened in Latvia, and all four were arrested together on December 2, 2018 when attempting to leave the United States at JFK airport. *Id.* ¶ 32. Of the four individuals arrested at JFK, Volksons is most similar to Berns Both arrived in the United States at approximately the same time in mid-October 2018 and had the two highest amounts of victim transfers into their bank accounts.

Other than those with whom Volksons was arrested at JFK, Volksons is most similarly situated to Toms Saulgriezis. It is the Government's understanding that Petrovs, Grigorjevs, Berns, Volksons, and Saulgriezis were supervised by the same individual in Latvia. Volksons received and withdrew a greater amount of victim funds than Saulgriezis. Saulgriezis's accounts, however, received seven smaller transfers from victims, while Volksons's accounts received larger deposits from victims of the scheme. Saulgriezis also engaged in this illegal activity in the United States for a lengthier period of time than Volksons.

## B. The Plea and Guidelines Calculation

On December 2, 2018, Volksons was arrested along with three other co-conspirators at JFK. *Id.* ¶ 32. On March 5, 2019, pursuant to a plea agreement, Volksons pleaded guilty to conspiracy to commit bank and wire fraud, as charged in a one-count superseding Information. *Id.* ¶ 3. In the plea agreement, the parties stipulated to a Sentencing Guidelines offense level of 18 and a criminal history category of I, resulting in a Guidelines range of 27 to 33 months' imprisonment. *Id.* The Guidelines calculation of the PSR is in accord with the stipulated Guidelines range in the plea agreement. *Id.* ¶ 110.

### C.  Discussion

#### 1.  Applicable Law

As the court is aware, the Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18  U.S.C. § 3553(a)(2).

#### 2.  A Guidelines Sentence Is Reasonable in This Case

The Government respectfully submits that a sentence within the Guidelines range to which the parties stipulated of 27 to 33 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  Weighing the applicable factors under 18 U.S.C. § 3553(a)(2), it is clear that the seriousness of the offense, and the need to promote respect for the law, provide just punishment, afford adequate deterrence and protect the public, are all significant considerations in crafting a just sentence given the conduct at issue in this case.

*First*, a Guidelines sentence is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to provide just punishment.  The conspiracy outlined herein resulted in millions of dollars in losses to consumers.  As this Court is aware and has previously acknowledged while sentencing co-conspirators, the victims of the conspiracy have by

and large been everyday Americans.  As reflected in victim impact statements, many victims devoted considerable savings and emotional investment to their intended purchases – frequently classic cars or farm equipment or machinery.[1]  Many of the victims have reported saving funds and waiting for the right opportunity, and nearly all describe their surprise at being taken by a complex scam.  The conspirators went to impressive lengths; far from a random, mass email conceit that would take a substantial share of unsophisticated victims, the conspirators posted ads using real business identities, took pains to provide photographs, VIN numbers, registration information, insurance history, and detailed records about the cars in an effort to prove their authenticity and *bona fides* as dealers.

The defendant's role in the case was therefore critical.  By impersonating a shell corporation and opening corporate banking accounts, the defendant played a crucial part in convincing even careful victims to part with tens of thousands of dollars.  Believing they were sending their money to a business – with all the legitimacy and protection that sense conveyed – the victims did not suspect their money was vanishing without any real possibility of recourse. The Government does not contend that the defendant was personally posting the ads or acting as the principal contact with the victims, but his role implicated fundamental and repeated misrepresentations to the banks and direct contact with the victim funds, some of which he kept, and some of which he passed along to co-conspirators.  Simply put, the fraud cannot be completed without front-line participants like the defendant.

Significantly, the defendant traveled to the United States for the purpose of engaging in this scheme.  While he claims that he was unaware of its fraudulent nature until he arrived in the United States, he admits that he was aware the scheme involved (1) withdrawing money in cash for the purported purchase of goods, (2) receiving a regular portion of those proceeds, and (3) paying a set amount to his recruiter.  PSR ¶ 52.  This is a highly unusual, if not plainly illegal, variety of business.  The fact that the defendant traveled to this country specifically to take part in this undertaking heightens the seriousness of the offense conduct.

*Second*, a sentence within the stipulated Guidelines range is significant, and is necessary to afford adequate deterrence to both the defendant as well as others similarly situated.  While specific deterrence is relevant to the defendant's case, the Government submits that general deterrence is the more resonant concern here.  As is evidenced by the size of this case, the amount of loss to victims, and the number of victims, the crimes committed by the defendant are both incredibly serious and all too common.  A sentence within the Guidelines range will help send a message to other individuals that taking part in such activity is not a risk-free enterprise.

---

[1]   Redacted victim impact statements are available on the 16-cr-692 docket at ECF Nos. 82, 94, 244, 245, 253, and 330.

The stipulated range fairly accounts for the length of the defendant's participation in the fraudulent activity, his use of multiple accounts through which victim funds passed, and the seriousness of the impact on the victims of the conspiracy.   To reflect Volksons's relative culpability, a Guidelines sentence between 27 and 33 months is appropriate.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: *Daniel Nessim*
Emily A. Johnson / Matthew J.C. Hellman /
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-2409 / -2278 / -2486

cc:     Zachary Taylor, Esq. (by ECF)